**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| RICHARD DENNIS, on behalf of himself and all others similarly situated,<br><br>               Plaintiff,<br><br>      - against –<br><br><br><br>KRAFT FOODS GROUP, INC. AND MONDELĒZ GLOBAL LLC,<br><br>              Defendants. | Civil Action No. _____<br><br><br><br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Richard Dennis ("Plaintiff") complains, upon knowledge as to himself and his own acts and upon information and belief as to all other matters, against Defendants Kraft Foods Group, Inc. and Mondelēz Global LLC (collectively, "Defendants") as follows:

**NATURE OF THE ACTION**

1.      This action arises from Defendants' unlawful and intentional manipulation of the prices of cash wheat and wheat futures contracts traded on the Chicago Board of Trade ("CBOT") during the period of at least January 1, 2003 through January 2014 (the "Class Period"), in violation of the Commodity Exchange Act, 7 U.S.C. § 1, *et seq*. (the "CEA").

2.      Kraft produces some of the most iconic snack foods in American history, including the Oreo, Wheat Thin, Ritz cracker, Triscuit, and Chips Ahoy! cookie.  While each snack may taste different, they all have one thing in common – they contain wheat.

3.      This makes Kraft one of the largest end users of wheat in the country.  In order to satisfy demand for its snack foods, Kraft consumes roughly 30 million bushels of #2 Soft Red Winter Wheat each year, which it transforms into flower at its Toledo, Ohio, mill.

4.      #2 Soft Red Winter Wheat is the same variety of wheat deliverable against the CBOT wheat futures contract.

5.      Given the large amount of #2 Soft Red Winter Wheat that it consumes on a daily basis Kraft has a large exposure to changes in wheat prices.  Rather than managing this exposure through ordinary (and legal) means, beginning in or about 2003 and continuing through January 2014, Defendants executed a comprehensive strategy to manipulate the prices of cash wheat and wheat futures contracts traded on the CBOT for their financial benefit.

6.      *First,* prior to each of the five annual delivery periods for CBOT wheat, Kraft and Mondelēz conducted off-exchange futures transactions between the two separate Kraft corporate trading accounts that carried Kraft's long and short positions, improperly offsetting Kraft's short positions with its long positions.

7.      *Second*, in late Summer 2011, Defendants Kraft Foods Group, Inc. and Mondelēz Global LLC developed and, in December 2011 successfully executed a strategy to manipulate the prices of CBOT wheat futures contracts.  Specifically, in response to high cash wheat prices in late Summer 2011, Kraft and Mondelēz developed, approved, and executed in early December 2011 a strategy to buy $90 million of December 2011 CBOT wheat futures, which amounted to a six-month supply of wheat.  Kraft and Mondelēz had no economic reason to conduct these trades and never intended to take delivery of this wheat.  Instead Defendants executed this strategy with the intention that the market would react to their enormous long position by lowering cash wheat prices and increase the spread between December 2011 and March 2012 CBOT wheat futures

2

contracts. These artificial price shifts did in fact occur and as revealed in internal Kraft communications released by the U.S. Commodity Futures Trading Commission, Kraft and Mondelēz illegitimately made over $5.4 million in profits as a result of these transactions.

8.      *Third*, on five days in December 2011, Kraft and Mondelēz held long positions in December 2011 wheat that exceeded the CBOT's 600-contract speculative spot month position limit by as much as 2,110 contracts.

9.      By executing this manipulative strategy, Defendants not only saved money on their wheat purchases, increasing revenue in their snack food businesses, but also generated a profit on their speculative trading positions. However, while these illicit profits benefited Defendants' bottom line, they caused harm to Class members who transacted in CBOT wheat futures contracts at artificial prices proximately caused by Defendants' manipulative conduct.

10.     Given the long-term, secretive nature of Defendants' manipulative scheme, Plaintiff believes that more evidence supporting the allegations in this Complaint will be uncovered after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

11.     This action arises under Section 22 of the CEA, 7 U.S.C. §25.

12.     Wheat is a "commodity" in interstate commerce and is the "commodity underlying" CBOT wheat futures and option contracts, as those terms are defined and used in Section 1a(9) and 22 of the CEA, 7 U.S.C. §§ 1a(9) and 25(a)(1)(D), respectively.

13.     This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. §25, 28 U.S.C. §§1331 and 1337.

14.     Venue is proper in the Northern District of Illinois pursuant to Section 22 of the CEA, 7 U.S.C. §25(c), 28 U.S.C. §1391(b) through (d). Defendants maintain offices in the

Northern District of Illinois, transacted business in the Northern District of Illinois, the claims arose in the Northern District of Illinois, and a substantial part of the events or omissions giving rise to the claims occurred in the Northern District of Illinois.

15.     Defendants, directly and indirectly, made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails in connection with the unlawful acts and practices and course of business alleged herein.

16.     The CBOT is located in this District at 141 West Jackson Boulevard, Chicago, Illinois, 60604.  Defendants' unlawful acts manipulated the prices of CBOT wheat futures and options contracts which are traded in this District on the CBOT.  The CBOT became a wholly-owned subsidiary of the CME Group Inc. ("CME") in or around July 2007.

17.     The CBOT is designated by the CFTC as a board of trade.  The CBOT applies to the CFTC for permission to trade each commodity in which the CBOT offers a contract.  The CBOT must establish, among other things, that the proposed contract is not prone to price manipulation in order to win approval to trade such contract. CBOT members and clearing members have to follow the rules of the CBOT.  This includes the most important rules, the rules prohibiting manipulation.

## PARTIES

18.     Plaintiff Richard Dennis ("Dennis") is a natural person, who resides in Chicago, Illinois.  Dennis traded thousands of CBOT wheat futures contracts during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation as alleged herein. Plaintiff was deprived of transacting in a lawful, non-manipulated market in CBOT wheat futures contracts, and otherwise suffered legal injury as a direct and proximate result of Defendants' manipulative conduct.

19.     Defendant Kraft Foods Group, Inc. headquartered in Northfield, Illinois, is one of North America's largest consumer packaged food and beverage companies.

20.     Defendant Mondelēz Global LLC headquartered in Deerfield, Illinois, operates the North American snack food business for Mondelēz International, Inc.

21.     Prior to October 2012, Kraft Foods Inc. owned Kraft Foods Group, Inc., which operated the North American snack food business.  In October 2012, Kraft Foods Inc. effected a spin-off transaction where (a) Kraft Foods Group, Inc. transferred the North American snack foods business to its then-affiliate Mondelēz Global LLC and (b) Kraft Foods Inc. then distributed Kraft Foods Group, Inc. to its shareholders in a tax-free spin-off.  Kraft Foods Inc. then changed its name to Mondelēz International, Inc., which has since owned Mondelēz Global LLC, which operates the North American snack food business.  The operative spin-off agreements apportion liability between Kraft Foods Group, Inc. and Mondelēz International, Inc.

<u>**SUBSTANTIVE ALLEGATIONS**</u>

I.      **Background**

   **A. Commodity Futures and Options Contracts**

22.      A commodity futures contract is a standardized bilateral executory agreement for the purchase and sale of a particular commodity.  In the context of futures trading, a commodity is the underlying instrument upon which a futures contract is based.

23.     The bilateral aspect of the futures contract is that there is a seller and a buyer.

24.     The sellers are one-half of the bilateral futures contract and one-half of the commodity futures market.  They are referred to as "shorts."

25.     The buyers are the other one-half, and are referred to as "longs."

26.     Futures contracts may be settled by delivery of the actual commodity at the conclusion of the contract or "offset" by entering an equal and opposite trade, effectively eliminating the original position.

27.     Open interest is the total number of futures contracts long or short in a delivery month that has been entered into and not yet liquidated by an offsetting transaction or fulfilled by delivery.

28.     Volume is the number of futures contracts traded during a specific period of time.

**B.  CBOT Wheat Futures and Option Contracts**

29.     CBOT wheat futures and option contracts are transacted electronically on the CME's Globex electronic trading platform and also through open outcry on the trading floor of the CBOT.  Open outcry is a method of public auction for making bids and offers in the trading pits of futures exchanges.

30.     The size of a CBOT wheat futures contract is 5,000 bushels of wheat, subject to further quality specifications, and prices are quoted in cents per bushel.

31.     The "tick size" or minimum price fluctuation for trading wheat futures is ¼ cent per bushel, which is equivalent to $12.50 per futures contract, including spreads.

32.     CBOT wheat futures contracts are traded for delivery during five different contract months each calendar year: March (H), May (K), July (N), September (U), and December (Z).

33.     CBOT wheat futures contracts call for settlement by physical delivery.

34.     Delivery on the CBOT wheat contract is effected when the seller of the futures contract tenders a "shipping certificate" (which represents an interest in wheat for load-out from

a CBOT-approved delivery facility) to the buyer of the futures contract. Shipping certificates may also be bought and sold between traders or exchanged for futures positions.

35.     Trading in CBOT wheat futures contracts terminates the business day prior to the 15th calendar day in the contract month.

36.     CBOT wheat option contracts are the same size as one CBOT wheat futures contract.

37.     Trading in CBOT wheat futures and options contracts is subject to the rules and regulations of the CBOT. Such rules and regulations include speculative position limits established by the CBOT and approved by the CFTC.

### C. Kraft and the Wheat Physical and Futures Market

38.     Kraft is one of the largest domestic end users of #2 Soft Red Winter Wheat, which is the variety of wheat deliverable against the CBOT wheat futures contract. Kraft consumes approximately 30 million bushels of wheat per year (or roughly 2.5 million bushels per month) for use in production of its iconic brands like Oreo, Chips Ahoy!, Ritz, Triscuit, and Wheat Thins. Ninety percent of the wheat used by Kraft is milled into flour at Kraft's Toledo, Ohio Flour Mill.

39.     In order to produce usable flour, Kraft requires wheat for milling that meets certain specifications for baking and human consumption. These specifications include the permissible numbers of insect damaged kernels and maximum allowable levels of vomitoxin (a mycotoxin that may be produced in wheat infected by Fusarium head blight or scab). According to the U.S. Food and Drug Administration, finished baked goods must have a vomitoxin level below one part per million. Normal wheat milling processes and cleaning technologies can substantially reduce vomitoxin levels in finished flour by approximately one-half from the level

in unprocessed wheat. Vomitoxin levels in finished flour also can be reduced in the milling process by blending in wheat possessing lower vomitoxim levels.

40.     Kraft will also consider certain baking characteristics of wheat, including gluten content and solvent retention levels, to ensure that it is able to produce flour that will meet its baking needs.

41.     Kraft typically purchases wheat on a daily basis throughout the year, seeking to ensure that it always has sufficient supply for its mills.  Kraft has the capacity to store 5 million bushels of unprocessed wheat at its Toldeo mill, and it strives to maintain two months' supply in its inventory.

42.     Kraft has two primary options for obtaining the wheat it requires.  First, it can purchase wheat directly from a grain producer or wholesaler in the cash market.  When Kraft sources through the cash market, it can negotiate the wheat specifications in the contracts to ensure that the quality of wheat meets its requirements.  For example, in its contracts, Kraft regularly specifies a maximum vomitoxin level of 2 parts per million and maximum insect damaged kernels of 3 per 100 grams.

43.     When Kraft purchases wheat in the cash market, it can also negotiate the delivery location and process.  Because of the location of its Toledo mill, when it purchases wheat in the cash market, Kraft will ordinarily source wheat from the Toledo region, which includes Ohio, Indiana, Michigan, and Ontario, and have it delivered to Toledo by rail or truck.  Warehouses and shipping stations outside the Toledo region, including those down the Mississippi River, are not required to transport wheat to Toledo by rail or truck.  Consequently, it is not advantageous for Kraft to take delivery of wheat down the Mississippi River, as Kraft would have to arrange for the wheat to be barged to a location where it could be transferred to rail, and then shipped to

its Toledo mill, significantly increasing the cost to Kraft. It is not possible to barge wheat directly from locations down the Mississippi River to Kraft's Toledo mill.

44. Kraft's second option for sourcing wheat is to purchase wheat futures contracts.

45. Wheat acquired via the futures market is typically of a lower quality than that sourced in the cash market because more varieties of wheat can be used to satisfy delivery obligations. For example, CBOT rules specified that deliverable wheat could have vomitoxin levels of up to 4 parts per million; the deliverable wheat actually available rarely had levels below two parts per million and would not meet Kraft's standards.

46. Further, parties who take delivery of CBOT wheat do not have the ability to specify delivery location or load out process, nor do they even know the delivery location for the contracts they have purchased until they receive shipping certificates, making it impractical for someone like Kraft, who needs wheat at a fixed location, to take delivery.

47. Because of the inability to control wheat quality or delivery location, Kraft rarely takes delivery of wheat via the CBOT delivery process. Indeed, Kraft typically specifies in its cash market contracts that it will not accept wheat registered for delivery under CBOT contracts because such wheat is typically blended down by mixing lower quality product so that the overall mixture will barely meet the minimum CBOT requirements.

48. Prior to Fall 2011, Kraft last took delivery of wheat via the CBOT delivery process in 2002. Instead of taking delivery of CBOT wheat, Kraft normally uses the CBOT futures markets to "hedge" its cash wheat purchases, taking long futures positions that roughly correlate with its actual wheat needs protecting against a change in wheat prices, and then offsetting these positions as it acquires physical wheat in the cash market.

## II.     Kraft Manipulated the Wheat Markets in Fall 2011

49.     In late Summer 2011, cash wheat prices for #2 Soft Red Winter Wheat at Toledo, Ohio had risen from a price of $5.74 per bushel on June 30, 2011 to $7.72 per bushel on August 26, 2011.  Over the same time, the price of December 2011 CBOT wheat futures increased from $6.57½ to $7.97.  Even though cash wheat prices were rising, there was sufficient wheat available in the cash wheat market for Kraft to purchase and deliver to its Toledo mill to satisfy Kraft's needs.

50.     In response to these elevated cash wheat prices, however, Kraft deviated from its practice of using the futures markets solely to hedge its cash wheat purchases.  Kraft wheat procurement staff developed, and Kraft senior management approved, a manipulative strategy to use its status as a commercial hedger to acquire a huge long position in December 2011 wheat futures in order to induce sellers to believe that Kraft would take delivery, load out, and use that wheat in its Toledo mill.  In developing this strategy, Kraft, acting through certain of its procurement staff and certain senior management, intended that the CBOT futures market would react to its enormous long position by increasing the price of the December 2011 CBOT futures contract while reducing the differential between the December futures price and the price of the cash market wheat.  Kraft executed its plan, and the market reacted as Kraft expected, yielding Kraft more than $5.4 million in futures trading profits and savings from its strategy.

51.     In fact, Kraft, acting through its procurement staff, acquired its December 2011 long position without any intention of loading out, delivering, and using the majority of the CBOT wheat it stood to acquire.

52.     Kraft, acting through its procurement staff, executed a "trial run" of this strategy in September 2011, taking delivery of 250,000 bushels of CBOT wheat, which constituted fifty

total certificates. Upon standing for delivery, thirty-one of the fifty certificates that Kraft received in September 2011 were for wheat located at locations on the Mississippi River that were more than 650 miles from Kraft's Toledo mill and would have required at least two changes in mode of transport and shipment in the opposite direction of the commercial flow of wheat to bring to the Toledo mill. This meant that Kraft could not use barges to transport the wheat directly to the Toledo mill and, due to exchange rules, Kraft could not require that the wheat be loaded directly on to rail transport. As a result of this test involving just fifty certificates, Kraft knew that it could not rely upon taking delivery of CBOT wheat to source wheat easily transportable to the Toledo mill.

53. Nevertheless, in October 2011, Kraft wheat procurement staff proposed to Kraft senior management that Kraft adopt a strategy of buying $90 million of December 2011 CBOT wheat futures in early December 2011 in order to depress the price of wheat in the cash market and artificially inflate the CBOT wheat futures price.

54. In an October 20, 2011 email to Kraft's Chief Financial Officer and other senior management, the Kraft Senior Director Global Procurement, explained the strategy as follows:

> Given our proposal to "take physical delivery in Dec" of 15 mm bushels at 50 cents per bushel below the commercially offered price results in the savings of $7mm+.
>
> In addition, **there is a key market dynamic that is important to understand: Once the market sees that Kraft is "stopping" December wheat, we anticipate the futures curve will begin to flatten, reducing the profitability of wheat storage, thereby reducing the commercial wheat basis to Kraft**. We will then have the option of redelivering the wheat acquired through the futures market. This will then quickly reverse the negative cash flow impact.

(emphasis added).

55.     When considering the Kraft procurement staff's $90 million December 2011 CBOT wheat futures proposal, Kraft senior management required that its CBOT futures position could not exceed $50 million by the end of December.  Kraft procurement staff agreed to sell at least $40 million of the proposed $90 million position by the end of the month.  Kraft senior management then approved the procurement staff proposal for Kraft to buy $90 million of December 2011 CBOT wheat futures, knowing that procurement staff would sell $40 million of the position before the end of the month.

56.     Kraft did not have a *bona fide* commercial need for $90 million in CBOT wheat futures contracts – which would amount to approximately 15 million bushels, or a six-month supply for its Toledo mill – in December 2011.  Kraft had never possessed that quantity of wheat, and had no ability to store that quantity of wheat within its own facilities.  Indeed, Kraft did not even have a *bona fide* commercial need for or present ability to store $50 million of wheat (its proposed $90 million position net of selling $40 million) – which would amount to more than an additional three months' supply for its Toledo mill.

57.     As of November 2011, Kraft already possessed more than 4.2 million bushels of wheat in storage at its Toledo mill, which represented more than 80% of its storage capacity.  If Kraft were to have taken delivery of 15 million bushels of wheat – an amount equivalent to approximately 3,000 certificates – in December 2011, it would have had to locate additional storage and pay additional costs of approximately five cents per bushel for nearly all of the wheat for up to six months.  In addition, in order to use CBOT wheat, Kraft would have had to buy— and store—yet additional higher-quality cash wheat to blend with the lower-quality CBOT wheat so as to ensure the wheat would meet its baking specifications.  Thus, Kraft would have needed to locate and pay for storage of far in excess of 15 million bushels.

58.     Kraft never intended to take delivery of 15 million bushels of wheat, but instead desired to make the market believe that it would take delivery, load out, and store that wheat for use in the Mill.  Kraft intended for the market to react to its long position by lowering the price of cash wheat available in the Toledo area, which would allow Kraft to obtain wheat in the cash market at more favorable prices. Kraft also intended to profit from the positions it held in December and March wheat futures by narrowing the spread between the two contracts.

59.     Kraft procurement employees, including the Senior Director Global Procurement and the Associate Director of Procurement, executed the strategy, ultimately accumulating 3150 long CBOT December 2011 wheat futures contracts by November 29, 2011, the first day of the delivery period, equivalent to 15.75 million bushels or approximately $93.5 million of wheat.  As of December 7, 2011, Kraft's spot month wheat position constituted 87% percent of the CBOT December 2011 wheat futures open interest.

60.     In a second email to Kraft senior management on December 2, 2011 email, the Kraft Senior Director Global Procurement confirmed that the strategy was working as planned:

> As you may recall, we established a long Dec Wheat/Short March Wheat spread at 35 cents (Mar premium to Dec) for the purpose of taking delivery of CME wheat, representing a $7MM+ saving over commercially sourced wheat.  Since Monday we have "stopped" 2.2MM bushels of wheat at a cost of $13.2MM.  **As expected, the Dec/Mar spread has narrowed to app[roximately] 11 cents resulting in a marked to market gain of $3.6MM on our open spread position. Meanwhile, with the narrowing spread, the cash wheat basis has declined from +80 cents to +50 cents over Dec futures.**  As we begin purchasing this cheaper basis commercial wheat, we will unwind the existing spread position. If all goes according to plan, we will still save $7MM on the commercial cost of wheat vs where it was a few weeks ago as well as make $2-3MM on reversing out of the Dec/Mar wheat spread.

(emphasis added).

61.     Upon standing for delivery of CBOT December 2011 wheat contracts, the shipping certificates that Kraft received were all for wheat located in warehouses on the

Mississippi River, which are outside the Toledo region and are not required to transport wheat to Toledo by rail. To take delivery, Kraft had to arrange for the wheat to be barged to a location where it could be transferred to rail, and then shipped to the Mill. These shipping arrangements significantly increased Kraft's costs by approximately $1.21 per bushel.

62. Ultimately, Kraft took delivery of 1320 shipping certificates for December 2011 CBOT wheat, or a total of 6.6 million bushels. It loaded out just 660,000 bushels (132 contracts) of that wheat, which was less than 5% of the wheat position it carried in early December and equivalent to approximately $4 million worth of wheat. After prices in the cash market declined, Kraft resold 1188 of its December 2011 shipping certificates for $35,725,074.

63. On December 9, Kraft offset all of its 826 remaining long futures contracts in the market (80% of the CBOT open interest), which amounted to 78.3% of the trading volume that day. Kraft did not purchase a similar quantity of wheat in the cash market, which would be expected if it had really needed that wheat for its operations.

64. Kraft's actions proximately caused cash wheat prices in Toledo to decline and the December 2011/March 2012 wheat futures spread to narrow, which was favorable to Kraft. In particular, December 11 wheat futures prices increased from $5.75 as of November 28, 2011 to $6.12 as of December 2, 2011. Cash wheat prices in Toledo declined from $6.16 per bushel as of December 2, 2011 to $5.86 per bushel as of December 9, 2011. As a result of these price shifts, Kraft earned over $5.4 million in profits.

**A. Kraft Violated Speculative Position Limits**

65. The CFTC specified the position limit levels for wheat futures. It published those levels in CFTC Regulation 150.2, 17 C.F.R. § 150.2 (2011), which provided that no person may hold or control a net long or net short position for the purchase or sale of wheat for future

delivery traded on the CBOT in excess of 600 contracts in the spot month, or in excess of 5,000 contracts for any single contract month or 6,500 contracts for all months combined. These position limits are intended to protect the futures market from excessive speculation that could cause unreasonable or unwarranted price fluctuations.

66.     The CBOT adopted speculative position limits for CBOT wheat futures at the Commission-specified levels.  The CBOT position limit scheme for wheat futures included a prohibition against trading in excess of position limits, which provided that the position limit levels applicable to those contracts with position limits are set forth in the "Position Limit, Position Accountability and Reportable Level Table" ("Table") in the Interpretations Section at the end of Chapter 5 of the exchange rules.  The Table identified a wheat futures spot month level of 600 contracts in the spot month, or in excess of 5,000 contracts for any single contract month or 6,500 contracts for all months combined.

67.     Traders who are *bona fide* hedgers – such as producers or end-users of particular commodities, like Kraft – can apply for exemptions to speculative position limits based on a demonstration of *bona fide* hedging needs. Requests for hedge exemptions from exchange limits must be submitted to the CME, which reviews the requests and, if approved, issues a letter setting out the specific additional limit it has approved for the entity. Hedge exemptions are valid for one calendar year and are renewable only through the submission of another application to the CME.

68.     The CBOT speculative position limit for wheat futures contracts was 600 contracts during the spot month. Spot month is defined as commencing at the close of business on the business day prior to the first notice day—the day after which the purchaser of a futures contract may be required to take physical delivery—for any delivery month and terminating at

the end of the delivery period. For the December 2011 CBOT wheat contract, the spot month

period began on November 29, 2011.

69.     As a commercial end user of flour, Kraft is eligible to seek a hedge exemption to

cover its wheat needs. In or about October 2010, Kraft submitted such an application to the

CME. On October 22, 2010, it received an exemption approval letter, permitting it to maintain

wheat positions in excess of the speculative position limit, effective December 1, 2010. The

exemption approval letter noted that "positions in the last five days of trading of any futures

contract may not exceed Kraft Foods, Inc.'s unfilled anticipated requirements of the same cash

commodity for that month and the next succeeding month."

70.     The exemption approval specifically noted that exemptions must be renewed on

an annual basis and that any application by Kraft to renew its exemption must be submitted to

the CME by no later than December 1, 2011.

71.     Kraft did not submit a request for renewal of its hedge exemption until December

28, 2011. Consequently, beginning on December 2, Kraft no longer had a CME hedge

exemption for the December 2011 wheat contract and it was bound by the 600 contract

speculative position limit in that commodity. Kraft also did not request a hedge exemption with

the Commission for December 2011.

72.     Kraft did not have a *bona fide* commercial need for the long futures position that

it acquired in December 2011 wheat.

73.     Kraft held long positions in December 2011 wheat that exceeded the mandated

speculative position limit for wheat on December 2, 5, 6, 7 and 8 by 2,110, 2106, 1,666, 1,226

and 226 contracts respectively.

16

74.     Kraft also accepted delivery of 1320 December wheat futures contracts between November 30, 2011 and December 7, 2011.

**B. Kraft Engaged in Fictitious EFP Transactions**

75.     Kraft maintains several trading accounts in which it does wheat futures transactions for both long and short hedging purposes.  Kraft's internal computer software cannot distinguish between long and short positions for the same contract month within the same account, so Kraft's practice has been to place its long wheat futures position in one account and its short wheat futures position in a second account to keep track of them.

76.     Beginning in or about 2003 and continuing through January 2014, prior to each of the five annual delivery periods for CBOT wheat, Kraft conducted an off-exchange transaction between the two Kraft accounts carrying the long and short positions whereby Kraft's short position was offset by its long position. Kraft's finance department determined the price level at which each transaction would be done and communicated that information to wheat procurement staff who directed Kraft's clearing firm to execute the transaction.  Each of the transactions was cleared through the CME as an EFP.

77.     Noncompetitive, off-exchange futures trades are permitted only when they are executed in accordance with the rules of the relevant exchange.

78.     CME Rule 538 and CBOT Rule 538 permit "Exchanges for Related Positions" – of which EFPs are a sub-set – under certain conditions. EFPs are permissible only if they are between two independent parties and involve a privately negotiated and simultaneous exchange of a futures position for a corresponding and offsetting cash physical position.  EFPs must be cleared and reported to the appropriate exchange and the parties must prepare proper

documentation for both parts of the transaction, including the same documentation that would accompany any other sale of a physical commodity.

79.     Kraft controlled both trading accounts involved in these EFP transactions.  Kraft also did not actually transfer physical wheat in connection with any of the EFP transactions, nor did it create any of the documentation that ordinarily accompanies the sale of a physical commodity.  The only documentation for these EFP transactions are the notations of the transfer of the futures position between accounts in Kraft's futures account statements and internal records.  Because they did not involve the actual transfer of physical wheat between two independent parties, Kraft's EFPs were impermissible and violated Regulation 1.38.

## CLASS ACTION ALLEGATIONS

80.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and as a representative of the following Class:

> All persons or entities (other than Defendants and any parent, subsidiary, affiliate, or agent of any Defendant) that purchased and/or sold CBOT wheat futures and options contracts during the period of at least January 1, 2003 through January 2014 (the "Class Period").[1]

81.     The Class is so numerous that the individual joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff is informed and believes that at least thousands of geographically dispersed Class members transacted in CBOT wheat futures and options contracts during the Class Period.

82.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein.  The injuries and damages of each

---

[1] Plaintiff has defined the Class based on currently available information and hereby reserves the right to amend the definition of the Class, including, without limitation, the Class Period.

member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.

83.     Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff is an adequate representative of the Class and has no interests which are adverse to the interests of absent Class members.  Plaintiff has retained counsel competent and experienced in class action litigation, including commodity futures manipulation class action litigation.

84.     Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class.  These common questions of law and facts include, without limitation:

(a) Whether Defendants manipulated CBOT wheat futures and options contracts in violation of the CEA;

(b) Whether such manipulation caused CBOT wheat futures and options contracts to be artificial;

(c) Whether such manipulation caused cognizable legal injury under the CEA;

(d) The operative time period and extent of Defendants' foregoing violations; and

(e) Whether such injury or the fact or extent of such artificiality may be established by common, class-wide means, including, for example, by regression analysis, econometric formula, or other economic tests.

85.     A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate

claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

86.     Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

87.     By its very nature, the unlawful activity alleged herein that Defendants engaged in was self-concealing.

88.     Plaintiff and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or any of the facts that could or would have led to the discovery thereof, until it became public on April 1, 2015.

89.     Because Defendants employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, Plaintiff and the Class counsel not have discovered the existence of this unlawful conduct any earlier than its public disclosure on April 1, 2015.

90.     Due to Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Class has been tolled during the period of such fraudulent concealment.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**(For Manipulation in Violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*)**

**Against All Defendants**

91.     Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

92.     Defendants, through their acts alleged herein, specifically intended to and did cause unlawful and artificial prices of CBOT wheat futures and options contracts during the Class Period.

93.     As alleged herein, Defendants had the ability to cause and did cause artificial prices.  Defendants' trading and other activities alleged herein constitute market power manipulation of the prices of CBOT wheat futures and options contracts in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a) and 25(a).

94.     As alleged herein, Defendants manipulated the price of a commodity in interstate commerce or for future delivery on or subject to the rules of any registered entity, in violation of the CEA.

95.     Defendants' foregoing extensive manipulative conduct deprived Plaintiff and other traders of a lawfully operating market during the Class Period.

96.     Plaintiff and others who transacted in CBOT wheat futures and options contracts during the Class Period transacted at artificial and unlawful prices resulting from Defendants' manipulations in violation of the CEA, 7 U.S.C. § 1, *et seq.*, and as a direct result thereof were injured and suffered damages.

97.     Plaintiff and the Class are each entitled to damages for the violations of the CEA alleged herein.

98.     Plaintiff and members of the Class who purchased or sold CBOT wheat futures and options contracts during the Class Period were injured and are each entitled to their actual damages for the violations of the CEA alleged herein.

## SECOND CLAIM FOR RELIEF

**(For Principal-Agent Liability in Violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.* and Regulation 180.1(a))**

### Against All Defendants

99.     Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

100.     Defendants intended to affect or acted recklessly with regards to affecting prices of CBOT wheat futures and options contracts and engaged in overt acts in furtherance of their intent.

101.     As alleged herein, Defendants intentionally or recklessly used or employed a manipulative device or artifice to defraud and engaged in any act, practice or course of business which operated or would operate as a fraud or deceit upon any person, in violation of Section 6(c)(1) of the CEA (7 U.S.C. §9), and Section 22 of the CEA (7 U.S.C. §25), and Regulation 180.1, 17 C.F.R. §180.1.

102.     Defendants' conduct proximately caused injury to Plaintiff and other members of the Class who transacted in an artificial and manipulated market, at manipulated prices during the Class Period.

103.     Plaintiff and the Class are each entitled to damages for the violations of the CEA alleged herein.

104.    Plaintiff and members of the Class who purchased or sold CBOT wheat futures and options contracts during the Class Period were injured and are each entitled to their actual damages for the violations of the CEA alleged herein.

## THIRD CLAIM FOR RELIEF

### (For Principal-Agent Liability in Violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*)

### Against All Defendants

105.    Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

106.    Each Defendant is liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

107.    Plaintiff and member of the Class are each entitled to actual damages sustained in CBOT wheat futures and options contracts for the violations of the CEA alleged herein.

## FOURTH CLAIM FOR RELIEF

### (For Aiding and Abetting Manipulation in Violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*)

### Against All Defendants

108.    Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

109.    Defendants knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA alleged herein.  Defendants did so knowing their manipulation of CBOT wheat futures and options contracts prices, and willfully intended to assist these manipulations,

which resulted in CBOT wheat futures and options contracts to reach artificial levels, during the

Class Period in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

110.    Plaintiff and member of the Class are each entitled to actual damages sustained in

CBOT wheat futures and options contracts for the violations of the CEA alleged herein.

## FIFTH CLAIM FOR RELIEF

### (Unjust Enrichment and Restitution/Disgorgement)

### Against All Defendants

111.    Plaintiff re-alleges and incorporates the preceding allegations of this Complaint

with the same force and effect as if fully restated herein.

112.    Defendants financially benefitted from their unlawful acts.  These unlawful acts

caused Plaintiff and other members of the Class to suffer injury, lose money, and transact in

CBOT wheat futures and options contracts at artificial prices.

113.    In addition to being unlawful, Defendants' acts are also unfair and inequitable.  It

is thus unjust and inequitable for Defendants to have unjustly enriched themselves and now

retain the benefits from manipulating CBOT wheat futures and options contracts.

114.    As a result of the foregoing, it is unjust and inequitable for Defendants to have

enriched themselves in this manner.

115.    Each Defendant should pay its own unjust enrichment to Plaintiff and members of

the Class.

## PRAYER FOR RELIEF

Accordingly, Plaintiff demands relief as follows:

A.     For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as the Class representative, and his counsel be appointed as Class counsel;

B.     For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

C.     For a judgment awarding Plaintiff and the Class any and all sums of Defendants' unjust enrichment;

D.     For an order impressing a constructive trust temporarily, preliminarily, permanently or otherwise on Defendants' unjust enrichment, including the portions thereof that were obtained at the expense of Plaintiff and the Class;

E.     For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

F.     For such other and further relief as the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff respectfully demands a trial by jury of all issues so triable.

Dated: Chicago, Illinois
      April 9, 2015

By:    /s/   Eugene J. Schiltz
      Eugene J. Schiltz
      **THE COLEMAN LAW FIRM**
      77 West Wacker Drive
      Chicago, IL  60601
      Tel.: 312-444-1000
      Fax: 312-444-1028

      **LOWEY DANNENBERG COHEN**
          **& HART, P.C**

      Vincent Briganti
      Geoffrey M. Horn
      Peter D. St. Phillip
      Raymond Girnys
      Christian Levis
      One North Broadway
      White Plains, New York 10601
      Tel.: 914-997-0500
      Fax: 914-997-0035

      *Counsel for Plaintiff and the Proposed*
      *Class*